**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Petitioners, | |
| v. | Miscellaneous Action No. 12-481 (BAH) |
| ISS MARINE SERVICES, INC., | Judge Beryl A. Howell |
| Respondent. | |

<u>**MEMORANDUM OPINION**</u>

The petitioners United States of America and United States Department of Defense

(collectively, "the Government") bring this Petition against the respondent ISS Marine Services,

Inc. ("ISS Marine") to enforce the respondent's compliance with an administrative subpoena

*duces tecum* issued by the Inspector General of the U.S. Department of Defense on March 28,

2011 (the "Subpoena").  In particular, the petitioners ask the Court to require the respondent to

produce the contents of a March 2008 internal audit report (the "Audit Report").  The primary

question presented by the Government's Petition is whether the Audit Report enjoys the

protection of either the attorney-client privilege or the work-product doctrine.[1]

## I.      BACKGROUND

ISS Marine is a United States affiliate of Inchcape Shipping Services Holdings, Ltd.

("Inchcape"), which is a company incorporated in the United Kingdom.  *See* Decl. of Simon

Tory ("Tory Decl.") ¶ 2, ECF No. 4-1; Pet. for Enforcement of Inspector General Subpoena & to

Compel Produc. of Audit Report & Related Rs. ("Petition") ¶ 6, ECF No. 1.  ISS Marine

---

[1] The respondent has requested a hearing on this matter, *see* ECF No. 19, at 6, a request which the Court denies.  *See* LCvR 7(f) ("A party may in a motion or opposition request an oral hearing, but its allowance shall be within the discretion of the court.").  The extensive briefing and exhibits presented by the parties provide a sufficient record for resolution of the Government's Petition and the related motion to seal.

"contracts with the [Department of Defense], through the U.S. Navy, to provide ship husbanding and other port services and goods to the Navy, Coast Guard, and other Government-owned ships." [2]  Petition ¶ 6.

A.     **The Audit Report**

One of the places where Inchcape contracted to provide husbanding services to the U.S. Government was in the Middle East.  *See generally* Petition Ex. 1, ECF No. 1-2.  In December 2007, two Inchcape employees traveled to Dubai and Bahrain to attend a corporate workshop and to inspect Inchcape facilities.  *See* Decl. of Larry Cosgriff ("Cosgriff Decl.") ¶ 4, ECF No. 16.  During this trip, the Inchcape employees reported "a variety of practices that Inchcape was engaging in" that raised concern about "potential liability for fraudulent conduct."  *Id.* ¶ 5.  In response, Larry Cosgriff, who was then Senior Vice-President of Government Services for Inchcape, brought the allegations to the attention of a partner at the Washington, D.C. law firm Arnold & Porter, LLC ("A&P"), with whom Inchcape regularly consulted.  *Id.* ¶¶ 6–7.

The A&P partner subsequently spoke directly to the two employees who reported on the questionable Inchcape practices, *id.* ¶ 7, and to the CEO of Inchcape, Claus Hyldager, *id.* ¶ 8. On January 21, 2008, A&P sent a draft engagement letter to Cosgriff and Hyldager, proposing the retention of A&P to conduct an internal investigation.  *See id.*  Thereafter, Cosgriff, Hyldager, and Simon Tory, the Group Company Secretary for Inchcape's subsidiary ISS Group Holdings Limited ("ISS Group"), met to discuss the draft engagement letter.  *Id.* ¶ 9.  According to Cosgriff, Hyldager "expressed dismay, both orally and in writing, that [Cosgriff] had involved counsel in th[e] matter," and both Hyldager and Tory "rejected [Cosgriff's] recommendation that

---

[2] As described by the Government, "husbanding services" are "support and logistics services" provided to ships, such as "providing pierside and anchorage services, obtaining subsistence items, passing ship's orders, providing interpreter services, providing limited force protection services, arranging for trash and human waste removal, providing potable water, procuring tug and shore services, arranging for the procurement of other supplies and services, and providing general assistance."  Mem. of P. & A. in Supp. Pet. for Enforcement of Inspector General Subpoena & to Compel Produc. of Audit Report & Related Rs. ("Pet'rs' Mem.") at 3–4, ECF No. 1-1.

[Inchcape] retain A&P to conduct an investigation." *Id.* ¶¶ 9–10.  Instead, Cosgriff states that

Hyldager informed him "that [Hyldager], Mr. Tory and the Inchcape Board of Directors had

decided that Mr. Tory would institute an internal audit of Inchcape's billing and accounting

practices" and that "Inchcape's Board of Directors would utilize the audit findings to determine

how it would proceed in addressing the matter." *Id.* ¶ 11.  Since "the internal audit would be

carried out by Inchcape internal auditor Bharat Khadalia, under the direction of Mr. Tory,"

Cosgriff states that he cautioned Hyldager and Tory that "the investigation itself and its findings

would not be protected by attorney client privilege," and he asserts "[b]oth men stated that they

understood that fact." *Id.* ¶¶ 11–12.  According to Cosgriff, A&P sent a second draft

engagement letter to Hyldager on January 29, 2008, which "stated that A&P would support the

investigation for purposes of advising Inchcape of its legal obligations, [but] the engagement

letter did not provide for any role by A&P in the conduct of the investigation." *Id.* ¶ 13.

Ultimately, it was Cosgriff's understanding that "Messrs. Hyldager and Tory undertook this

internal audit to obtain information to enable Messrs. Hyldager and Tory, the Inchcape audit

committee and the Inchcape Board of Directors to make a business decision as to what further

action, if any, Inchcape would take to address" the allegations raised by the two Inchcape

employees. *Id.* ¶ 15.

   Tory, however, recalls these events somewhat differently.  He states that ISS Group

"engaged [A&P] to provide legal advice with respect to concerns about alleged practices of one

of its associate companies in the Persian Gulf region," and that A&P not only recommended

conducting an internal investigation but also "prepared a list of documents necessary to more

fully assess the issues identified" and "prepared a legal memorandum . . . summarizing the

potential criminal and civil liability implicated by the activities as reported."  Tory Decl. ¶ 3.

Furthermore, Tory states that, after reviewing A&P's memorandum and recommendations, Hyldager "instructed [Tory] to pursue the internal investigation . . . in consultation with outside counsel and using the legal and investigation guidance that [A&P] had provided." *Id.* ¶ 4. Tory asserts that "[o]ur purpose was to obtain the facts [A&P] indicated it needed to provide the company with legal advice." *Id.*

The internal investigation was conducted over the next few weeks by Bharat Khadalia, "an internal auditor" at Inchcape, who prepared a draft report of his findings that was completed on March 5, 2008. *Id.* ¶¶ 5–6. The Audit Report was marked "Confidential," Tory Decl. ¶ 6, but was not marked as privileged, Cosgriff Decl. ¶ 16. After the draft of the Audit Report was complete, Khadalia sent it to Hyldager and Tory. *See id.*; Tory Decl. ¶¶ 5–6. After reviewing the draft report, "Hyldager decided to follow up directly with some of the witnesses to ensure that the information provided to [A&P] was complete," which took "approximately two additional months." Tory Decl. ¶ 7. Then, on May 6, 2008, Hyldager sent the final version of the Audit Report via e-mail to A&P, Cosgriff, and Tory and described the report as "our internal auditor[']s report." *See* Cosgriff Decl. ¶ 16; Tory Decl. ¶ 8; *see also* Petition Ex. 10, ECF No. 1-11. Tory asserts that Hyldager sent the Audit Report to A&P "for its review and further assessment," as an attachment to an e-mail "marked 'Attorney Client Privileged' because we were sending it to the law firm for legal advice." Tory Decl. ¶ 8. Several months later, on October 25, 2008, Cosgriff forwarded Hyldager's e-mail, with the Audit Report attached, to Noah Rudolph who was the Chief Operating Officer for Inchcape's Government Services Division. Cosgriff ¶ 17; Petition Ex. 10.

### B.   Government Investigation and Subpoena

Sometime after the Audit Report was completed, the Government began "investigating whether Inchcape charged the Navy more than the amounts permissible under its contracts and

whether Inchcape failed to make required reconciliation payments to the Navy for amounts overbilled on an interim basis."  Pet'rs' Mem. at 4.  The Government informed Inchcape's counsel of this investigation by letter dated September 2, 2010.  *See* Petition Ex. 11, ECF No. 1-12.  As a part of that investigation, the Office of the Inspector General of the Department of Defense issued a subpoena to ISS Marine dated March 28, 2011, which sought the production of several categories of documents, including "[a]ll documents concerning any audit, study, or investigation of ISS regarding goods provided or services performed" under Inchcape's contracts with the U.S. Government.[3]  Petition Ex. 2, at 10.  The Subpoena listed the return date for the documents as May 20, 2011 at 10 A.M., and it instructed ISS Marine that "[i]f a claim of privilege is asserted in response to any document requested by this subpoena . . . you are directed to provide a privilege log wherein you identify . . . the specific privilege being asserted."  *Id.* at 1, 5.

ISS Marine and the Government agreed that ISS Marine would produce any non-privileged, hard-copy documents on a rolling basis, starting May 20, 2011.  *See* Resp't's Opp'n to Pet. for Enforcement of Inspector General Subpoena & to Compel Produc. of Audit Report & Related Rs. ("Resp't's Opp'n") at 3, ECF No. 8; *see also id.* Ex. 1, at 1, ECF No. 4-2 ("As discussed with [government counsel], we will produce non-privileged responsive materials on a rolling basis.").  ISS Marine completed its production of non-privileged, hard-copy documents on July 29, 2011.  *See* Resp't's Opp'n at 3; *see also id.* Ex. 3, at 1, ECF No. 4-3.  ISS Marine and the Government also "agreed that electronic document collection and search would commence after they had mutually agreed on a search protocol."  Resp't's Opp'n at 4.

---

[3] For purposes of the subpoena, the term "ISS" referred to ISS Marine as well as Inchcape and its other subsidiaries around the world.  *See* Petition Ex. 2, at 3, ECF No. 1-3.

At a meeting on June 9, 2011—while the production of non-privileged, hard-copy documents was still ongoing—counsel for ISS Marine and the Government met to discuss the production, and counsel for ISS Marine stated in that meeting that "all responsive audits, including the March 2008 audit report, were prepared at the request of counsel, and thus, appeared to assert that such documents were subject to both attorney-client privilege and protection as attorney work-product." Petition Ex. 3, at 1. The Government, meanwhile, had previously obtained a copy of the Audit Report from an unnamed source. Petition ¶ 16; *see also* Pet'rs' Mem. at 5; Petition Ex. 3, at 1–2. After the June 9, 2011, meeting, the Government "segregated and sealed all prior-obtained copies of the March 2008 audit report" and "wrote a July 6, 2011, letter to ISS counsel to inform ISS of the Government's prior collection and review of the audit report." Petition ¶ 21. ISS Marine responded to the Government's July 6, 2011, letter in a letter of its own dated December 1, 2011, which summarized ISS Marine's position that the Audit Report was privileged and that ISS Marine had invoked its privilege in a timely fashion. *See* Resp't's Opp'n Ex. 4, ECF No. 4-4.

The parties remain at an impasse about the production of the Audit Report. As a result, the Government filed the Petition in this miscellaneous action on September 11, 2012, asking the Court to order ISS Marine to produce the Audit Report (and any other "documents and materials related to that audit report within [ISS Marine's] possession, custody, and control"), and to allow the Government to "use and review a previously obtained copy of that report." Petition at 6.[4] For the reasons discussed below, the Court grants the Government's Petition.

---

[4] Briefing on the Government's Petition and subsequent request to unseal this action was completed on November 8, 2012.

## II.  LEGAL STANDARD

A "'court's role in a proceeding to enforce an administrative subpoena is a strictly limited one.'"  *Resolution Trust Corp. v. Frates*, 61 F.3d 962, 964 (D.C. Cir. 1995) (quoting *FTC v. Texaco, Inc.*, 555 F.2d 862, 871–72 (D.C. Cir. 1977) (en banc)).  "An administrative subpoena must be enforced if the information sought 'is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant.'"  *Resolution Trust Corp. v. Walde*, 18 F.3d 943, 946 (D.C. Cir. 1994) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950)).  "Under the law of this Circuit, a subpoena issued pursuant to federal law is governed by the federal law of privilege."  *United States v. Cal. Rural Legal Assistance, Inc.*, 824 F. Supp. 2d 31, 43 (D.D.C. 2011) (citing *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.*, 5 F.3d 1508, 1513 (D.C. Cir. 1993)).

"It is well established that the proponent of a privilege bears the burden of demonstrating facts sufficient to establish the privilege's applicability."  *In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n* ("*In re CFTC Subpoena*"), 439 F.3d 740, 750 (D.C. Cir. 2006); *accord In re Lindsey*, 158 F.3d 1263, 11269 (D.C. Cir. 1998) ("It is settled law that the party claiming the privilege bears the burden of proving that the communications are protected."); *In re Slack*, 768 F. Supp. 2d 189, 193 (D.D.C. 2011) ("A person who withholds otherwise discoverable material or testimony based upon a claim of privilege bears the burden of demonstrating that the privilege applies and that withholding is excused.").  "The basis of [a] privilege must be adequately established in the record, through evidence sufficient . . . to establish the privilege . . . with reasonable certainty."  *In re CFTC Subpoena*, 439 F.3d at 750–51 (alterations in original) (citations and internal quotation marks omitted).  To discharge this burden, the proponent of a privilege "must adduce competent evidence in support of its claims"

and "must offer more than just conclusory statements, generalized assertions, and unsworn averments of its counsel." *In re Veiga*, 746 F. Supp. 2d 27, 33–34 (D.D.C. 2010).

## III.   DISCUSSION

The respondent resists production of the Audit Report on two grounds.  The Court will first discuss the respondent's claim to attorney-client privilege and then will address its claim under the work-product doctrine.  Finally, the Court will address the Government's request to unseal this matter and place it on the public docket.

### A.   Attorney-Client Privilege

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).  "Its purpose is to encourage full and frank communications between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id.*  "The attorney-client privilege protects the confidential communications made between clients and their attorneys when the communications are for the purpose of securing legal advice." *In re Lindsey*, 158 F.3d at 1267.  All privileges that protect against forced disclosure, however, "are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon*, 418 U.S. 683, 710 (1974).  Although "complications in the application of the privilege arise when the client is a corporation," the Supreme Court has held that, in the corporate context, the privilege applies as long as "[t]he communications at issue were made by [company] employees to counsel for [the company] acting as such, at the direction of corporate superiors in order to secure legal advice from counsel." *Upjohn*, 449 U.S. at 389, 394.  The Supreme Court has also clearly recognized that "the privilege exists to protect not only the giving of professional advice to those who can act on

it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Id.* at 390.

The crux of the attorney-client privilege question in this case is the purpose(s) for which the investigation was conducted and the Audit Report was created. To be privileged, a communication must be "for the purpose of securing *primarily* either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding." *In re Grand Jury*, 475 F.3d 1299, 1304 (D.C. Cir. 2007) (emphasis added) (internal quotation marks omitted). In evaluating whether the primary purpose of a communication is to seek legal advice, some courts require a showing that the communication would not have been made "but for" the fact that legal advice was sought. *See, e.g.*, *First Chi. Int'l v. United Exch. Co.*, 125 F.R.D. 55, 57 (S.D.N.Y. 1989). Other courts have taken a broader view, extending the privilege to any "communications intended to keep the attorney apprised of business matters" if those communications "embody an implied request for legal advice based thereon." *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 404 (8th Cir. 1987) (internal quotation mark omitted). The Court concludes, however, that the "but for" formulation of the primary purpose standard is most faithful to this Circuit's guidance that "the 'attorney-client privilege must be strictly confined within the narrowest possible limits consistent with the logic of its principle." *See In re Lindsey*, 158 F.3d at 1272 (internal quotation marks omitted) (quoting *In re Sealed Case*, 676 F.2d 793, 807 n.44 (D.C. Cir. 1982)); *accord Fisher v. United States*, 425 U.S. 391, 403 (1976) ("[S]ince the privilege has the effect of withholding relevant information from the fact-finder, it applies only when necessary to achieve its purpose. Accordingly it protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege."). If a communication would have been made even if legal advice were not explicitly being sought, then it is difficult to say that

that communication's primary purpose was to seek legal advice.  As one commentator has observed in the context of internal investigations:

> [I]f the investigation was of a nature that the business would ordinarily have conducted [it] in all events . . . then the privilege will not apply.  But if the investigation was conducted which would not have been conducted in the ordinary course of business but so that an attorney could be apprised of the underlying information so that legal advice could be given, it will be privilege protected.  Much depends on how the investigation is structured before it is even begun, what the employees are told is the purpose of the interviews, and how the facts are cast . . . .

1 EDNA SELAN EPSTEIN, THE ATTORNEY-CLIENT PRIVILEGE AND THE WORK-PRODUCT DOCTRINE 356 (5th ed. 2007).  "[D]ocuments prepared by non-attorneys and addressed to non-attorneys with copies routed to counsel are generally not privileged since they are not communications made primarily for legal advice."  *Neuder v. Battelle Pac. Nw. Nat'l Lab.*, 194 F.R.D. 289, 295 (D.D.C. 2000) (quoting *Pacamor Bearings, Inc. v. Minebea Co.*, 918 F. Supp. 491, 511 (D.N.H. 1996)).  Nevertheless, the mere fact that a document is created by a non-attorney is not dispositive of the privilege question, so long as the communication of the document to counsel was confidential and for the primary purpose of seeking legal advice.  *See In re Grand Jury (Attorney-Client Privilege)*, 527 F.3d 200, 201 (D.C. Cir. 2008) ("Attorney-client privilege applies to a document a client transfers to his attorney 'for the purpose of obtaining legal advice.'" (quoting *Fisher*, 425 U.S. at 404–05)).[5]

In applying these principles, the Government argues that the Audit Report was not created for the purpose of seeking legal advice.  The Government posits that "nothing about the March 2008 Audit Report indicates that it was part of a request for legal advice," the Report was

---

[5] The privilege can also extend to "reports of third parties made at the request of an attorney or the client where the purpose of the report was to put in usable form information obtained from the client."  *FTC v. TRW, Inc.*, 628 F.2d 207, 212 (D.C. Cir. 1980).  This rule, however, is intended to apply only where the interposing of the third party "is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit."  *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961) (Friendly, J.).  Since the report in this action was not prepared by a third party, but rather by the client itself, this doctrine does not apply.

"not directed to any attorney or a person employed by an attorney," it "does not contain any

legends indicating that it is privileged," and "Inchcape's CEO waited nearly two months after it

was completed to forward the Audit Report to its outside counsel." Pet'rs' Mem. at 12. In

support of this argument, the Government offers the sworn declaration of Larry Cosgriff, who

served as the Senior Vice-President of Inchcape Government Services during the relevant time

period. As discussed above, Cosgriff states that it was his understanding that Hyldager and Tory

"undertook this internal audit to obtain information to enable Messrs. Hyldager and Tory, the

Inchcape audit committee and the Inchcape Board of Directors to make a business decision as to

what further action, if any, Inchcape would take to address" the allegations raised by the two

Inchcape employees. Cosgriff Decl. ¶ 15.

ISS Marine responds, however, that the Audit Report "was specifically prepared to be

sent, and was in fact sent, under the explicit legend 'Attorney-Client Privileged,' to outside

counsel for the purpose of obtaining legal advice." Resp't's Opp'n at 6. ISS Marine maintains

that, although the Audit Report was prepared by a non-attorney (Khadalia) and was initially

transmitted to non-attorneys (Hyldiger, Cosgriff, and Tory) before being sent to outside counsel,

the Audit Report was "part of an on-going attorney-client communication for the purpose of

obtaining legal advice about concerns over potentially serious misconduct and exposure to

criminal and civil liability." *Id.* at 8. ISS Marine argues, relying on Tory's sworn declaration,

that the Audit Report was created and transmitted for the purpose of seeking legal advice

because A&P "framed the issues, identified information to collect and outlined the legal

framework" for the investigation. *Id.*

The respondent has failed, however, in light of the Cosgriff Declaration, to put forth

evidence "sufficient . . . to establish the privilege . . . with reasonable certainty." *In re CFTC*

*Subpoena*, 439 F.3d at 750–51.  At bottom, the respondent's claim to privilege appears to be premised on a gimmick:  exclude counsel from conducting the internal investigation but retain them in a watered-down capacity to "consult" on the investigation in order to cloak the investigation with privilege.  Unfortunately for the respondent, this sort of "consultation lite" does not qualify the Audit Report for the protections of the attorney-client privilege.  First and foremost, the fact that Inchcape purposefully eschewed the involvement of outside counsel—or any attorneys whatsoever—in the internal investigation and audit militates strongly against applying the attorney-client privilege.  When a company fails to involve lawyers directly in an internal investigation, the company faces a higher burden to demonstrate that the attorney-client privilege applies to the results of that investigation.  The Tory Declaration indicates that, at most, A&P generically "recommended initiating an internal investigation" and drafted a memorandum that "framed" the issues relating to "potential criminal and civil liability implicated by the activities as reported."  Tory Decl. ¶¶ 3, 6; *see also* Resp't's Opp'n at 2.  The Tory Declaration also states that A&P "prepared a list of documents necessary to more fully assess the issues identified," Tory Decl. ¶ 3, though Tory notably does not specify that *A&P* would be the ones "more fully assess[ing] the issues identified."  Although Tory states that he pursued the internal investigation "in consultation with outside counsel," *id.* ¶ 4, the record is devoid of any evidence to suggest that A&P provided any consultation to ISS Marine while the investigation was actually being conducted.  A&P's framing of the issues related to potential liability and its guidance about the types of documents that would be helpful all took place before the investigation began.  As Cosgriff explains:  "A&P did not participate in the interview process or the review of documentary evidence."  Cosgriff Decl. ¶ 14.  Even when Inchcape took steps to

verify the information in the Audit Report, Tory indicates that Hyldager performed this "follow

up," rather than an attorney.  Tory Decl. ¶ 7.

This sort of arms-length coaching by counsel, as opposed to the direct involvement of an

attorney, undercuts the purposes of the attorney-client privilege in the context of an internal

investigation.  Clearly, when an attorney is absent from the information-gathering process, "the

original communicator has no intention that the information be provided a lawyer for the

purposes of legal representation."  *Nesse v. Shaw Pittman*, 206 F.R.D. 325, 330 (D.D.C. 2002).

"At that point, the interest in advancing client candor has become so attenuated, if it exists at all,

that [it] is trumped by the law's interest in ascertaining the truth."  *Id.*  This principle discussed in

*Nesse* is consistent with the Supreme Court's teaching in *Upjohn*, where the Court emphasized

that the privilege attached to internal investigation materials because "the employees themselves

were sufficiently aware that they were being questioned in order that the corporation could

obtain legal advice," and the questions presented to the employees, at times directly by counsel,

"clearly indicated the legal implications of the investigation."  *Upjohn*, 449 U.S. at 394; *see also*

1 EPSTEIN, THE ATTORNEY-CLIENT PRIVILEGE AND THE WORK-PRODUCT DOCTRINE at 356

(noting the importance of "what the employees are told is the purpose of the interviews").

The respondent has offered no evidence to demonstrate that the employees who were

interviewed had any idea that their responses were going to be conveyed to an attorney for the

purpose of obtaining legal advice.  Indeed, it appears that Inchcape affirmatively did *not* want its

employees to know that the investigation related to legal concerns, *see* Cosgriff Decl. ¶ 10

(stating that Hyldager "did not want to alarm Inchcape Middle East employees and deflate their

morale by having an outside law firm making inquiries").  The top management also fully

understood that the failure to involve attorneys in the investigation was likely to forfeit the

protections of the attorney-client privilege. *Id.* ¶ 12. The employees certainly would not have been able to infer the legal nature of the inquiry by virtue of the interviewer, who was a non-attorney.

*Upjohn* makes clear that the privilege applies as long as "[t]he communications at issue were made by [company] employees *to counsel* for [the company] acting as such." *Upjohn*, 449 U.S. at 394 (emphasis added). Here, the employees were communicating to a non-attorney who was not accompanied or assisted by attorneys, and the communicators did not know that the information they were conveying would be transmitted to counsel for the purpose of seeking legal advice. What is more, Tory does not state that he even informed Khadalia—the person conducting the investigation—that the investigation was for the purpose of seeking legal advice. Tory only told Khadalia that "the review was to be conducted immediately," that the investigation was supposed "to address the issues as framed by counsel," and that he was "to keep the information confidential." Tory Decl. ¶¶ 5–6. Thus, the Audit Report memorializing the contents of the documents and information gathered from this investigation and audit does not justify the protection of the attorney-client privilege. For the results of an internal investigation to enjoy the attorney-client privilege, the company must clearly structure the investigation as one seeking legal advice and must ensure that attorneys themselves conduct or supervise the inquiries and, at the very least, the company must make clear to the communicating employees that the information they provide will be transmitted to attorneys for the purpose of obtaining legal advice. Only then do the candor-promoting purposes of the privilege outweigh the public's and the adversary system's longstanding and important interest in scrutinizing "every man's evidence." *United States v. Bryan*, 339 U.S. 323, 331 (1950) (quoting 8 JOHN

HENRY WIGMORE, TREATISE ON THE ANGLO-AMERICAN SYSTEM OF EVIDENCE IN TRIALS AT COMMON LAW § 2192 (3d ed. 1940)).

Furthermore, the respondent has offered no evidence that A&P's legal advice regarding the alleged misconduct continued beyond the minimal materials that the firm provided to the respondent before the investigation took place.  According to Cosgriff, A&P sent an engagement letter to the respondent prior to the investigation, stating that "A&P would support the investigation for purposes of advising Inchcape of its legal obligations," Cosgriff Decl. ¶ 13, but the respondent has offered no evidence that this letter was ever even signed, let alone that A&P provided any support or legal advice during or after the investigation.[6]  After A&P allegedly provided initial guidance about how to conduct the internal investigation (none of which has been submitted by the respondent here), the trail of A&P's involvement goes cold once the Audit Report was forwarded to A&P on May 6, 2008.  One would expect that, if the investigation were conducted primarily to allow A&P to counsel the respondent, some kind of legal advice would have resulted from the Audit Report, but the respondent has not even suggested that A&P provided legal advice based on the Audit Report.  Furthermore, the fact that Inchcape waited two months to transmit the finished Audit Report to A&P is very revealing of the company's intentions—if the Audit Report had truly been prepared at the direction of counsel for the purpose of obtaining legal advice, communication of the completed report to counsel would have been more prompt than a matter of months.  This state of affairs collectively suggests that the Audit Report was sent to A&P not for the primary purpose of seeking legal advice, but rather merely to keep A&P informed about the results of the investigation.

---

[6] Although the record is somewhat unclear on this point, it is reasonable to infer that A&P's recommendation to conduct an internal investigation, along with its "list of documents necessary to more fully assess the issues identified" and the "legal memorandum . . . summarizing the potential criminal and civil liability implicated by the activities as reported," Tory Decl. ¶ 3, were all conveyed to Inchcape contemporaneously with A&P's first proposed engagement letter—the letter that proposed that A&P should conduct the investigation, which Inchcape rejected.

Finally, as the Government points out, the respondent had a clear business motivation to conduct the internal investigation and prepare the Audit Report: "it had a contractual obligation to return any overpayments to the Government."  Pet'rs' Reply in Further Supp. Pet. for Enforcement of Inspector General Subpoena & to Compel Produc. of Audit Report & Related Rs. ("Pet'rs' Reply") at 14, ECF No. 16.  Thus, although Tory makes the assertion that Inchcape's "purpose was to obtain the facts [A&P] indicated it needed to provide the company with legal advice," Tory Decl. ¶ 4, the minimal facts offered by the respondent are perfectly consistent with the notion that A&P's legal advice ceased prior to the investigation and was limited to instructing Inchcape how to conduct the investigation so that it could ascertain the existence and amount of any overpayments.  Indeed, according to Cosgriff, Hyldager chided him for involving A&P in the initial response to the allegations and declined to hire A&P for purpose of conducting the internal investigation.  Cosgriff Decl. ¶¶ 9–10.  The fact that Inchcape had an obvious and compelling business purpose to conduct an internal audit to ascertain any overpayments further militates in favor of concluding that the privilege does not apply because it suggests that the Audit Report would have been created even if Inchcape was not seeking legal advice.  *See First Chicago*, 125 F.R.D. at 57.

The burden is on the respondent to establish that the Audit Report is privileged, *see CFTC Subpoena*, 439 F.3d at 750, but the respondent has failed to offer any objective evidence to corroborate its stated intention to seek legal advice.  Indeed, the respondent has presented no evidence that A&P ever purported to provide legal advice during the preparation of the Audit Report or after the internal investigation was completed or that Inchcape ever actually sought such advice.  The respondent's supporting evidence boils down to two relatively brief communications with counsel before and after the internal auditor's investigation was conducted:

an engagement letter in which counsel agreed to be available for consultation (following rejection of counsel's proposal for an attorney-led investigation) at the outset and a brief e-mail forwarding the completed Audit Report at the end.  This limited interaction with counsel at the beginning and end of an otherwise attorney-free internal investigation is an insufficient basis to support application of the attorney-client privilege.  As a result of the foregoing analysis, the Court concludes that ISS Marine has failed to demonstrate that the Audit Report was prepared for the primary purpose of seeking legal advice, and therefore it is not entitled to the protection of the attorney-client privilege.

### B.  **Attorney Work-Product Doctrine**

The respondent also claims that the Audit Report is protected from disclosure because it is attorney work product.  *See* Resp't's Opp'n at 9–13.  The Supreme Court established the work-product doctrine in *Hickman v. Taylor*, 329 U.S. 495, 510 (1947), in which the Court recognized that "it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel."  Therefore, any attempt to obtain the work product of any attorney, such as "interviews, statements, memoranda, correspondence, briefs, mental impressions,[or] personal beliefs," simply "fall[s] outside the arena of discovery and contravenes the public policy underlying the orderly prosecution and defense of legal claims." *Id.* at 510–11.  Regarding the public policy underlying this rule, the Court explained:

> Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten.  An attorney's thoughts, heretofore inviolate, would not be his own.  Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial.  The effect on the legal profession would be demoralizing.  And the interests of the clients and the cause of justice would be poorly served.

*Id.* at 511.

The Supreme Court also recognized in *Hickman* that not "all written materials obtained or prepared by an adversary's counsel with any eye toward litigation are necessarily free from discovery in all cases." *Id.* at 511.  Whether or not work product is ultimately discoverable depends upon whether it contains facts or opinions. *See generally United States v. Clemens*, 793 F. Supp. 2d 236, 244–253 (D.D.C. 2011) (discussing principles distinguishing fact work product from opinion work product).  Insofar as work product contains "relevant and nonprivileged facts," *Hickman*, 329 U.S. at 511, a party may obtain that work product "upon a showing of substantial need for the materials and an undue hardship," *Dir., Office of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1307 (D.C. Cir. 1997).  In this sense, fact work product only retains "qualified protection." *In re Sealed Case*, 676 F.2d at 811.  On the other hand, insofar as work product contains an attorney's opinions, mental impressions, or legal theories prepared in anticipation of litigation, that work product is "virtually undiscoverable." *Office of Thrift Supervision*, 124 F.3d at 1307.  This dichotomy between fact and opinion work product is also reflected in Federal Rule of Civil Procedure 26(b)(3), which partially codifies the doctrine announced in *Hickman* and provides that a party may discover "documents and tangible things that are prepared in anticipation of litigation or for trial" if "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." FED. R. CIV. P. 26(b)(3).  Regardless of whether a court orders the discovery of fact work product, however, Rule 26(b)(3) requires courts to "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." *Id.*

The key phrase in Rule 23(b)(3) is that documents are only protected from disclosure when they were "prepared in anticipation of litigation." *Id.*; *see also Hickman*, 329 U.S. at 511

(describing attorney work product as that "prepared by an adversary's counsel with an eye toward litigation").  To determine whether a particular document was prepared in anticipation of litigation, this Circuit applies "the 'because of' test, asking 'whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'"  *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010) (quoting *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998)).[7]  "For a document to meet this standard, the lawyer must at least have had a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable."  *In re Sealed Case*, 146 F.3d at 884.

The D.C. Circuit has also recognized that "[u]nder the more lenient 'because of' test, material generated in anticipation of litigation may also be used for ordinary business purposes without losing its protected status."  *Deloitte*, 610 F.3d at 138; *see also United States v. Adlman*, 134 F.3d 1194, 1195 (2d Cir. 1998) ("[A] document created because of anticipated litigation . . . does not lose work-product protection merely because it is intended to assist in the making of a business decision influenced by the likely outcome of the anticipated litigation.").  This aspect of the work-product doctrine allows courts to extend work-product protection to a document that "serves multiple purposes, so long as the protected material was prepared because of the prospect of litigation."  *Deloitte*, 610 F.3d at 138.  Acknowledging that so-called multi-purpose documents are *capable* of enjoying work-product protection, however, says nothing of what a party must show to demonstrate that a multi-purpose document was in fact prepared because of

---

[7] One commentator has observed that this formulation of the "because of" test used by the D.C. Circuit and others "is a tautology if ever there was one."  2 EPSTEIN, THE ATTORNEY-CLIENT PRIVILEGE AND THE WORK-PRODUCT DOCTRINE at 858.  It bears noting, however, that the because of test is more lenient than the "primary motivating purpose" test used by the Third and Fifth Circuits.  *See, e.g., Sharp v. Gov't of V.I.*, 77 F. App'x 82, 85 (3d Cir. 2003) (citing *United States v. Rockwell Int'l*, 897 F.2d 1255, 1266 (3d Cir. 1990)); *In re Kaiser Aluminum & Chem. Co.*, 214 F.3d 586, 593 (5th Cir. 2000) (citing *United States v. El Paso Co.*, 682 F.2d 530, 542 (5th Cir. 1982)).

anticipated litigation.  To be sure, a party bears a heavier burden when seeking work-product

protection for a multi-purpose document because the D.C. Circuit has also recognized that "the

[work-product] privilege has no applicability to documents prepared by lawyers 'in the ordinary

course of business or for other nonlitigation purposes.'"  *In re Sealed Case*, 146 F.3d at 887

(quoting *Linde Thomson*, 5 F.3d at 1515).  It is the proponent of the work-product protection that

bears the burden of demonstrating that the prospect of litigation was an independent, legitimate,

and genuine purpose for the document's creation.

Additionally, although the doctrine is known as the *attorney* work-product doctrine, work

product created by non-attorneys can also be protected if it is "so intertwined with the legal

analysis as to warrant protection."  *Deloitte*, 610 F.3d at 139; *see also Judicial Watch, Inc. v.*

*U.S. Dep't of Homeland Sec.*, 736 F. Supp. 2d 202, 209 (D.D.C. 2010) (noting that attorney

work-product protection applies to "materials prepared by . . . non-attorneys supervised by

attorneys").  Once again, although materials prepared by non-attorneys supervised by attorneys

are *capable* of enjoying work-product protection, the degree to which counsel is involved in

creating the document bears directly on whether the document was prepared in anticipation of

litigation.  This relationship can be thought of as a sliding scale, whereby a party's burden to

demonstrate a document's litigious purpose increases—all other things being equal—as attorney

involvement in creating the document decreases.  This simple principle recognizes the reality

that attorneys are the ones who actually litigate cases, and whether or not a company involves

attorneys in creating a document is a telling indication about whether the document was prepared

in anticipation of litigation.  *See, e.g.*, *In re Apollo Grp., Inc. Sec. Litig.*, 251 F.R.D. 12, 20, 22,

24–25 (D.D.C. 2008) (where declarations and e-mails established that attorneys "were intimately

involved in designing and implementing the review process," they "'led and advised the program

review team on how to conduct a program review,'" and conducted interviews, documents "coordinating the Program Review" were prepared in anticipation of litigation).[8]

The Government argues that the Audit Report is not covered by the work-product doctrine because "there was no reasonable anticipation of litigation at the time ISS generated the Report." Pet'rs' Mem. at 13. In particular, the Government points out that Inchcape was not aware of the Government's investigation until September 2010 (over two and one half years after the Audit Report was completed), the Audit Report "addressed 'allegations made by ISS personnel,' not prospective claims asserted by a third-party," and the Audit Report was commissioned "in order to better understand its financial operations and accounting, rather than in anticipation of a Government investigation or litigation." *Id.* at 15–16. The respondent counters that the Audit Report was prepared in anticipation of litigation because "[a]llegations of possible violations of federal law made by its own employees gave the company subjective and objective anticipation of a whistleblower lawsuit." Resp't's Opp'n at 10. As Tory states in his declaration, "[Hyldager and Tory] both understood that if [Inchcape's Middle East subsidiary] were not complying with the terms and conditions of the [Government] Contract, [the company] could be subject to litigation with the U.S. Navy and perhaps worse." Tory Decl. ¶ 4. The respondent also argues that A&P's recommendation to conduct an internal investigation "confirm[s] the reasonableness of ISS Group senior management's litigation fears." Respt's' Opp'n at 10.

---

[8] *See also Goff v. Harrah's Operating Co.*, 240 F.R.D. 659, 661 (D. Nev. 2007) ("[C]ourts have emphasized attorney involvement because such involvement clearly indicates that the documents were 'prepared in anticipation of litigation.'" (quoting FED. R. CIV. P. 26(b)(3))); *Wikel v. Wal-Mart Stores, Inc.*, 197 F.R.D. 493, 495 (N.D. Okla. 2000) ("[I]nvolvement of any attorney is a highly relevant factor. The involvement of an attorney makes it more likely than not that the focus has shifted toward litigation, making materials more likely to have been prepared in anticipation of litigation."); 2 EPSTEIN, THE ATTORNEY-CLIENT PRIVILEGE AND THE WORK-PRODUCT DOCTRINE at 863 (observing that courts often look to, *inter alia*, whether counsel was "involved in the preparation of the document" and whether counsel was "retained with an eye toward litigation" in determining whether the document was prepared in anticipation of litigation).

In this Circuit, it is still somewhat unclear how specifically a party must anticipate litigation in order to invoke the work-product doctrine in the context of a corporate internal investigation.  Thus far, the Circuit has employed two standards of specificity.  In one line of cases, the Circuit has insisted that, in order for work-product protection to apply, "the documents must at least have been prepared with a specific claim supported by concrete facts which would likely lead to litigation in mind." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 865 (D.C. Cir. 1980); *see also Safe Card Servs., Inc. v. SEC*, 926 F.2d 1197, 1203 (D.C. Cir. 1991) ("[W]here an attorney prepares a document in the course of an active investigation focusing upon specific events and a specific possible violation by a specific party, it has litigation sufficiently 'in mind' for that document to qualify as attorney work product.").  In another line of cases, however, the Circuit has eschewed a "specific claim" requirement and has instead employed a more lenient standard, extending work-product protection to "documents prepared in anticipation of foreseeable litigation, even if no specific claim is contemplated." *Schiller v. NLRB*, 964 F.2d 1205, 1208 (D.C. Cir. 1992), *abrogated on other grounds by Milner v. Dep't of Navy*, 131 S. Ct. 1259 (2011); *see also In re Sealed Case*, 146 F.3d at 886 ("If lawyers had to wait for specific claims to arise before their writings could enjoy work product protection, they would not likely risk taking notes about such matters or communicating in writing with colleagues, thus severely limiting their ability to advise clients effectively."); *Delaney, Migdail & Young, Chartered v. IRS*, 826 F.2d 124, 127 (D.C. Cir. 1987) ("Application of [the specific-claim] requirement here would ignore the function performed by the withheld material . . . and would conflict with the well established rules of discovery.").

In reconciling these two lines of cases, the Court in *In re Sealed Case* explained that the specific-claim requirement only applies when the documents at issue have been prepared "in

connection with active investigations of potential wrongdoing" and the attorney (or agent thereof) preparing the document acted "as [a] prosecutor[] or investigator[] of suspected wrongdoers." *In re Sealed Case*, 146 F.3d at 885.  By contrast, a more lenient specificity standard applies when the attorney (or agent thereof) preparing the document acted "as [a] legal advisor[] protecting the [attorney's] clients from the possibility of future litigation." *Id.* ("Here, as in *Delaney* and *Schiller*, the lawyer acted not as prosecutor or investigator, but rendered legal advice in order to protect the client from future litigation about a particular transaction, even though at the time, neither the FEC nor the DNC had made any specific claim.").  Taking a functionalist approach to the work-product doctrine, the Court observed that "[i]t is often prior to the emergence of specific claims that lawyers are best equipped either to help clients avoid litigation or to strengthen available defenses should litigation occur," and applying the specific-claim standard to lawyers taking prophylactic measures "would undermine lawyer effectiveness at a particularly critical stage of the legal representation." *Id.* at 886.

This guidance from the Circuit, however, does not fully address the issue presented in the instant action, which involves an internal audit report summarizing a corporate internal investigation into alleged wrongdoing.  In other words, the situation presented by this case appears to touch upon both of the scenarios that the Circuit carefully separated in *In re Sealed Case*:  the person preparing the Audit Report was both acting as an investigator into a specific allegation of wrongdoing and was also arguably trying to protect the company from the possibility of future litigation.

Under the stricter specific-claim standard, the respondent's claim to work-product protection fails.  The respondent has presented no evidence that "a specific claim [took] shape in the course of [the] audit," *Coastal States*, 617 F.2d at 865, and although the respondent makes

the conclusory assertion that "[a]llegations of possible violations of federal law" created a "subjective and objective anticipation of a whistleblower lawsuit," Resp't's Opp'n at 10, the respondent offers no evidence that would support an objectively reasonable anticipation of such a lawsuit.  There is no indication in the record, for example, that a whistleblower claim had even crossed the mind of either of the two employees who raised the allegations, and of course the Government was years away from initiating an investigation into the matter.  *Compare In re Sealed Case*, 146 F.3d at 886 (granting work-product protection where the attorney preparing the documents "kn[ew] critics were scrutinizing the RNC-NPF relationship" and thus "had a significant concern that litigation over this issue was probable"), *with Coastal States*, 617 F.2d at 865 ("To argue that every audit is potentially the subject of litigation is to go too far.  While abstractly true, the mere possibility is hardly tangible enough to support so broad a claim of privilege.").  On the other hand, under the purposes of the more lenient standard—which extends work-product protection to documents created "to protect the client from future litigation about a particular transaction," *In re Sealed Case*, 146 F.3d at 885—the respondent may have been entitled to work-product protection if the circumstances had included a key component, namely the direct involvement of counsel.  This is because, as the Circuit has observed, when an internal investigation is conducted into allegations of wrongdoing (even in the absence of a specific claim), "[w]eakening the ability of lawyers to represent clients at the pre-claim stage of anticipated litigation would inevitably reduce voluntary compliance with the law, produce more litigation, and increase the workload of government law-enforcement agencies."  *Id.* at 887.

In the end, the respondent's efforts to investigate the allegations of wrongdoing in this case do not fit neatly into the categories delineated by the Circuit in *Delaney*, *Schiller*, *In re Sealed Case*, *Coastal States*, and *SafeCard*.  As discussed above, however, two considerations

24

heighten the respondent's burden to show that the Audit Report is entitled to work-product

protection and therefore tip the balance against granting work-product protection to the Audit

Report in this case.  First, the document was created for multiple purposes.  As the Court noted

in discussing the application of the attorney-client privilege, it appears highly likely that

Inchcape would have conducted this internal investigation "in the ordinary course of business"

irrespective of the prospect of litigation.  *See In re Sealed Case*, 146 F.3d at 887.  The respondent

certainly does not argue that Inchcape would have simply sat on its hands in the face of these

allegations absent the possibility of litigation, and for good reason:  any responsible business

organization would investigate allegations of fraud, waste, or abuse in its operations.[9]  *See In re*

*Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 465 (S.D.N.Y. 1996) (noting that the company in

question "would have hired outside counsel to perform such an inquiry even if no litigation had

been threatened" because allegations of wrongdoing "presented [the company] not only with a

serious legal problem, but with a major business crisis").  "A more or less routine investigation

of a possibly resistible claim is not sufficient to immunize an investigative report developed in

the ordinary course of business."  *Janicker ex rel. Janicker v. George Wash. Univ.*, 94 F.R.D.

648, 650 (D.D.C. 1982).

Second, the fact that the investigation in this case was conducted by a non-attorney who

never communicated with outside counsel makes it all the more difficult for the respondent to

claim that the resulting Audit Report was prepared in anticipation of litigation.  Although the

record indicates that Khadalia was shown the memorandum from A&P (the contents of which

---

[9] The fact that outside counsel recommended that an internal investigation take place is not dispositive.  An internal investigation is, in essence, a fact-finding mission, and advising a company to investigate further when faced with allegations of internal misconduct is not necessarily legal advice—it is common sense, and therefore it does not necessarily touch upon the prospect of litigation.  It is only when counsel's strategic and legal expertise is applied and counsel's involvement becomes more direct and meaningful, *i.e.*, when counsel prioritizes the investigative steps, selects specific witnesses, conducts particular interviews, or reviews particular documents, that a company's genuine anticipation of litigation manifests itself.

are unclear), the respondent has presented no evidence that Khadalia ever communicated with A&P or that A&P was ever directly involved in making any of the decisions or setting any of the priorities for the investigation as it progressed. Thus, although work-product protection can apply to the work of non-attorneys supervised by attorneys, the "supervision" by attorneys in this case was so minimal and superficial that it bordered on being non-existent.[10] Minimal attorney involvement in an internal investigation represents a distinct difficulty for corporations claiming work-product privilege because it is the rare case in which a company genuinely anticipating litigation will leave its attorneys on the outside looking in.

In light of these two factual considerations—the obvious business purpose for the document and the minimal involvement of counsel in supervising the preparation of the document—the respondent's burden becomes more arduous. Indeed, the respondent finds itself in a position where it must present evidence that persuasively explains how the Audit Report could have genuinely been prepared in anticipation of litigation despite the fact that the attorneys' role was intentionally minimized in the internal investigation, and the company had an obvious non-litigation reason for conducting the investigation. Although it might be possible for a corporation to come forth with evidence sufficient to overcome this importunate factual predicate, it suffices to conclude that the respondent has wholly failed to do so here.

Even assuming that the Audit Report had been prepared in anticipation of litigation, however, the Government has demonstrated "a 'substantial need' for the [Audit Report] and an

---

[10] The Government does not appear to contest that Khadalia was a "non-attorney[] supervised by attorneys," whose work product could enjoy protection if it were prepared in anticipation of litigation. *See Judicial Watch*, 736 F. Supp. 2d at 209. Even if Khadalia were considered to have been "supervised" by attorneys, however, that characterization of Khadalia's role would still be reconcilable with the Court's holding that the Audit Report was not prepared for the purpose of seeking legal advice. The record supports the conclusion that A&P recommended that an internal investigation take place and provided some form of initial guidance to the company about how to conduct the investigation. This sort of guidance offered by A&P, even if it could perhaps qualify as supervision for purposes of the work-product doctrine, does not mean that the investigation was conducted for the primary purpose of seeking legal advice, for the reasons discussed above. *See, e.g.*, *In re Sealed Case*, 107 F.3d 46, 51 (D.C. Cir. 1997) (noting that "[t]he protection for attorney work product is broader than the attorney-client privilege").

inability to procure equivalent information 'without undue hardship.'" *Deloitte*, 610 F.3d at 135

(quoting FED. R. CIV. P. 26(b)(3)(A)(ii)). The subpoena in the instant case sought documents

from ISS Marine as well as its foreign affiliates (including Inchcape). *See* Petition Ex. 2, at 3, 8.

The respondent's position, however, is that all of the source documents underlying the Audit

Report are "in the exclusive custody and control of Inchcape's non-United States entities," and

are thus beyond the scope of the subpoena power. Pet'rs' Mem. at 7. Although the Government

does not concede this point, it observes that "[i]f ISS is correct . . . the Government is unable in

its investigation to compel the production of the underlying corporate records that it could use to

recreate the type of review contained in the March 2008 Audit Report." Pet'rs' Reply at 15.

This unequivocally constitutes "undue hardship" because it is unclear that the Government

would have *any* means to "procure equivalent information," let alone be able to do so "without

undue hardship." *Deloitte*, 610 F.3d at 135 (quoting FED. R. CIV. P. 26(b)(3)(A)(ii)).

Whether the Government has established "substantial need" for the Audit Report is a

closer question, but the specificity of the Government's request supports the conclusion that

"substantial need" is present here. As the Government points out, it seeks "a specific Audit

Report . . . to learn what Inchcape's executives knew of overpayments in March 2008 when

Inchcape has never disclosed any such overpayments to the Navy." Pet'rs' Reply at 16–17. In

other words, the Government needs not only the facts contained in the Audit Report (at least

some of which could arguably be obtained through other means), but the Government also needs

to know the fact that the Audit Report's contents were known by Inchcape at the time. The

Audit Report is both a factual document and an historical document—a snapshot in time of not

only "what [the company] knew" but also "*when* [they] knew it." Pet'rs' Mem. at 17 (emphasis

added). It is this overlapping temporal element to the Government's request that leads the Court

to conclude that the Government has a "substantial need" to obtain the Audit Report.  The respondent's attempts to characterize this as a "fishing expedition" or as "piggy-backing on the adverse party's efforts" are unavailing.  The Government's need is specific, and the Audit Report appears to be the only evidence of when the company became aware of any potential overpayments, which is likely to "go[] to the heart of the [Government's] case against [Inchcape]."  *In re HealthSouth Corp. Sec. Litig.*, 250 F.R.D. 8, 13 (D.D.C. 2008).

    **C.**    <u>**The Respondent's Motion to Seal**</u>

    When the Government filed its Petition, it requested leave to provisionally file its Petition and supporting papers under seal.  *See* Pet'rs' Mot. for Leave to Provisionally File Pet. & Supporting Papers Under Seal ("Pet'rs' Seal Mot."), ECF No. 2.  The Court granted that motion, and the Clerk has kept this entire matter under seal pending resolution of the Government's Petition.  The Government now argues that "the Court should lift the seal on this action and the parties' filings in it to date."  Pet'rs' Response to ISS's Mot. for Leave to File Under Seal ("Pet'rs' Seal Opp'n") at 1, ECF No. 15.

    The respondent's position is that "the issues raised by the government in its Petition should be litigated under seal" because the documents filed in this matter "contain[] information related to the government's non-public investigation of Respondent which is likely related to a civil false claims act lawsuit also filed under seal, as well as information concerning privileged documents and communications."  Resp't's Mot. for Leave to File Under Seal ("Resp't's Seal Mot.") at 1–2, ECF No. 10.  The Government contends, however, that "ISS has not identified any confidential portions of the record or any other appropriate reason to keep this matter under seal" and that "ISS's speculation [about a civil false claims act investigation] is irrelevant."  Pet'rs' Seal Opp'n at 1, 3.  The respondent's reply brief on this issue discusses the six-factor inquiry laid out in *United States v. Hubbard*, 650 F.2d 293 (D.C. Cir. 1980), which it says

supports sealing this case indefinitely.  *See* Reply in Supp. Mot. for Leave to File Under Seal

("Resp't's Seal Reply") at 2–5, ECF No. 19.[11]  The respondent further argues that the False

Claims Act's confidentiality provisions serve not only to protect the confidentiality of the

Government's investigation but also "to protect a defendant from adverse publicity and

reputational damage."  *Id.* at 6.

The Supreme Court has held that "the decision as to access [to judicial records] is one

best left to the sound discretion of the trial court, a discretion to be exercised in light of the

relevant facts and circumstances of the particular case."  *Nixon v. Warner Commc'ns, Inc.*, 435

U.S. 589, 599 (1978).  The D.C. Circuit has likewise held that "[t]his discretion should, of course

clearly be informed by this country's strong tradition of access to judicial proceedings."

*Hubbard*, 650 F.2d at 317 n.89.  Indeed, "[a]ccess to records serves the important functions of

ensuring the integrity of judicial proceedings in particular and of the law enforcement process

more generally."  *Id.* at 314–15.  "[T]he need for public access to judicial records may be

regarded as particularly vital where—as here—members of 'the taxpaying public are, in effect,

real parties in interest.'"  *United States v. Thomas*, 840 F. Supp. 2d 1, 3 (D.D.C. 2011) (quoting

*United States ex rel. Schweizer v. Oce N.V*, 577 F. Supp. 2d 169, 172 (D.D.C. 2008))).  Thus, "in

cases where the government is a party . . . [t]he appropriateness of making court filings

accessible is enhanced."  *EEOC v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1409 (D.C. Cir.

1996).

When faced with a motion to seal or unseal, the D.C. Circuit has instructed trial courts to

consider six factors relating to the generalized interests for and against public disclosure, which

"can be weighed without examining the contents of the documents at issue."  *See Hubbard*, 650

---

[11] Due to the procedural posture of this motion as a motion to seal, rather than a motion to *un*seal, the Government has not had an opportunity to respond to ISS Marine's arguments regarding the *Hubbard* factors.

F.2d at 317.  Those factors include:  (1) the need for public access to the documents at issue;
(2) previous public access to the documents; (3) the fact of an objection to public access and the
identity of those objecting to public access; (4) the strength of the generalized property and
privacy interests asserted; (5) the possibility of prejudice; and (6) the purposes for which the
documents were introduced.  *Id.* at 317–322.  It is the proponent of a motion to seal who must
demonstrate that these six factors, in totality, overcome the "'strong presumption in favor of
public access to judicial proceedings,'" which is "the starting point in considering a motion to
seal court records."  *Nat'l Children's Center*, 98 F.3d at 1409 (quoting *Johnson v. Greater Se.
Cnty. Hosp. Corp.*, 951 F.2d 1268, 1277 (D.C. Cir. 1991)).

　　　In this case, the only *Hubbard* factor that weighs against unsealing is the second:
previous public access to the documents.  As discussed above, this entire case has remained
under seal from the time it was filed, and therefore there has been no public access to this case.
All of the other *Hubbard* factors, however, are either neutral or weigh in favor of unsealing.

　　　To begin, the respondent misunderstands the meaning of the first factor in arguing that
"[t]he government has proffered no public need for access apart from a generalized need for
inspection."  Resp't's Seal Reply at 3.  It is not the Government's burden to proffer a need for
public access; the burden is instead the respondent's to demonstrate the *absence* of a need for
public access because the law presumes that the public is entitled to access the contents of
judicial proceedings.  *See Hubbard*, 650 F.2d at 314–15.  Although "[n]one of the documents
filed in this miscellaneous action have [previously] been referenced by or otherwise cited in a
public ruling of this Court," Resp't's Seal Reply at 3, this publicly filed opinion clearly abrogates
that state of affairs, *see, e.g.*, *Upshaw v. United States*, 754 F. Supp. 2d 24, 30 (D.D.C. 2010)
(noting that "open and transparent judicial decision-making" is "the basic premise underlying a

judicial system, such as ours, dependent upon the development of legal precedent through the

public issuance of court decisions").  Even recognizing the previously confidential nature of this

action, the mere fact that a case was, at one time, placed under seal is not a reason, in and of

itself, to indefinitely maintain that seal and thus negate the public's access to judicial records,

which the D.C. Circuit has described as "fundamental to a democratic state."  *Hubbard*, 650 F.3d

at 315 n.79.

 Next, the third, fourth, and fifth factors all militate in favor of unsealing this case.

Although the respondent objects to this case being unsealed, citing "a strong privacy interest in

non-disclosure," this case involves no objections to unsealing by third parties, which the Circuit

in *Hubbard* found to be particularly problematic.  *See Hubbard*, 650 F.3d at 319 ("[W]here a

third party's property and privacy rights are at issue the need for minimizing intrusion is

especially great . . . .").  Furthermore, the respondent has not identified any particular documents

in the record that contain sensitive, confidential, or privileged material.  Rather, the respondent

relies entirely on the privacy interests that would be implicated by revealing the fact that it is the

subject of some kind of government investigation, but these nebulous privacy interests are

unavailing.  Although the respondent repeatedly emphasizes the "pending confidential

investigation," that "involves serious allegations of misconduct which would expose Respondent

to reputational damage and harm," Resp't's Seal Reply at 3–4, the Government's investigation of

Inchcape has been public knowledge for some time.  Indeed, the global press reported in the

summer of 2010 that the bidding on a potential sale of Inchcape—which is privately held by a

state-controlled Dubai investment firm—collapsed after "several private equity groups  . . .

discover[ed] during due diligence what they believe is an investigation by DoJ over its contract

to service the US Navy's Fifth Fleet in the Middle East."  *See* Martin Arnold & Simeon Kerr,

*Blow for Dubai World Asset Sale*, Fin. Times, June 17, 2010, *available at*

http://www.ft.com/intl/cms/s/0/54e34f6c-7a29-11df-aa69-00144feabdc0.html#axzz2CgrqDsxj.[12]

Further, the *Financial Times* cited a source revealing that the investigation "was triggered by

information . . . about alleged corruption."  *Id.*  Finally, the Government has assured the Court

that "unsealing this matter poses no risk to the Government's ongoing investigation of ISS and

its related entities sufficient to create an exception to the public's constitutional right to open

judicial proceedings."  Pet'rs' Seal Opp'n at 4.  Thus, although certain aspects of the

Government's investigation may remain confidential, the simple fact that Inchcape is being

investigated is not a secret and does not justify continuing the seal on this action.

Finally, the sixth factor is either neutral or weighs in favor of unsealing.  This action was

brought for the limited purpose of enforcing a subpoena against the respondent to compel the

production of a specific document.  The Court has already concluded that the respondent must

produce that document.  Thus, the purposes for bringing this action would not be disserved by

unsealing, and as discussed above, publishing this opinion serves the important interest in

contributing to the body of case law developing and interpreting the important interests at issue

in this action:  the attorney-client privilege and the work-product doctrine.

As a result of the foregoing analysis, the Court concludes that the *Hubbard* factors weigh

in favor of unsealing this action in its entirety.

---

[12] *See also* Bruce Barnard, *Dubai World Sale of Inchcape Stalls*, J. of Com., June 18, 2010, *available at* http://www.joc.com/maritime-news/dubai-world-sale-inchcape-stalls_20100618.html; Quentin Webb & Alasdair Reilly, *US Probe Halts Sale of Dubai World's ISS—sources*, Reuters, June 17, 2010, available at http://www.reuters.com/article/2010/06/17/dubaiworld-iss-idUSLDE65G27Z20100617; DealBook, *Dubai World Sale Rocked by Justice Rumors*, N.Y. Times Online, June 18, 2010, http://dealbook.nytimes.com/2010/06/18/dubai-world-sale-rocked-by-justice-rumors/

**IV.      CONCLUSION**

For the reasons discussed above, the Audit Report is entitled to neither the attorney-client privilege nor work-product protection.  Even if the work-product protection applied, however, the Government has established that it has a substantial need for the Audit Report in order to prepare its case and that it cannot, without undue hardship, obtain the Audit Report's substantial equivalent by other means.  Therefore, the Government's Petition for Enforcement of Inspector General Subpoena and to Compel Production of Audit Report and Related Records, ECF No. 1, will be GRANTED, and the respondent must comply with the Subpoena within 14 days. Additionally, the Court concludes that the public's interest in open judicial proceedings require that this action be unsealed immediately.

An appropriate Order accompanies this Memorandum Opinion.

Date: November 21, 2012

_/s/ Beryl A. Howell_
BERYL A. HOWELL
United States District Judge